UNITED STATES, Appellee,

v.

Kevin M. HOLT, Lance Corporal, U.S. Marine Corps, Appellant.

No. 98–0037.
Crim.App. No. 94–2003.

U.S. Court of Appeals for the Armed Forces.

Argued May 13, 1999.

Decided Sept. 30, 1999.

EFFRON, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, CRAWFORD, and GIERKE, JJ., joined.

For Appellant: *William E. Cassara* (argued); *Lieutenant Dale O. Harris,* JAGC, USNR (on brief); *Lieutenant Syed N. Ahmad,* JAGC, USNR.

For Appellee: *Lieutenant Kevin S. Rosenberg,* JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler,* USMC, and *Commander Eugene E. Irvin,* JAGC, USN (on brief); *Commander D.H. Myers,* JAGC, USN.

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of conspiracy to commit larceny; premeditated murder; and larceny (3 specifications), in violation of Articles 81, 118, and 121, Uniform Code of Military Justice, 10 USC §§ 881, 918, and 921, respectively. He was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed. 46 MJ 853 (1997).

On appellant's petition, we granted review of the following issues:

I. WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED AS A MATTER OF LAW WHEN IT RULED THAT, ALTHOUGH THE ARTICLE 32(b) INVESTIGATING OFFICER DEPARTED FROM HIS PERMISSIBLE ROLE BY ACQUIRING THE SINGLE MOST IMPORTANT PIECE OF EVIDENCE TO CONVICT APPELLANT, AND THEN TURNED THAT EVIDENCE OVER TO THE TRIAL COUNSEL, SAID ACTION BY THE INVESTIGATING OFFICER DID NOT PREJUDICE APPELLANT.

II. WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED WHEN IT REFUSED TO REMAND THIS CASE TO THE CONVENING AUTHORITY FOR A *DUBAY* [17 USCMA 147, 37 CMR 411 (1967)] HEARING, DESPITE EVIDENCE GOVERNMENT WITNESSES TAMPERED WITH THE MOST SIGNIFICANT PIECE OF EVIDENCE USED TO CONVICT APPELLANT.

III. WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED WHEN IT RULED GOVERNMENT AGENTS HAD NOT VIOLATED THE RULE OF *UNITED STATES V. GARRIES,* [22 MJ 288 (CMA 1986)], DESPITE THEIR DESTRUCTION OF POTENTIALLY EXCULPATORY EVIDENCE THROUGH LUMINOL TESTING WHICH DEGRADED OR DESTROYED SAID EVIDENCE.

IV. WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED IN FINDING THE EVIDENCE LEGALLY SUFFICIENT TO PROVE APPELLANT GUILTY OF PREMEDITATED MURDER.

For the reasons discussed below, we affirm.

## I. BACKGROUND

Part A summarizes the evidence and theories presented by the parties during the findings phase of the trial. Part B describes the identification, testing, and consideration at trial of the evidence that is the focus of Issues I, II, and III.

## A. THE EVIDENCE AND THEORIES PRESENTED BY THE PARTIES ON FINDINGS

Appellant associated with a group of fellow Marines who shared a common interest in motorcycles. In March 1992, he and his friends stole a trailer, which they later used to transport their bikes. Subsequently, military investigative authorities located the trailer at Camp Pendleton.

On May 4, 1992, investigators questioned one of the Marines, Private (Pvt) Jonathan Sprenger, about the trailer. When Pvt Sprenger told the authorities that he owned the trailer but could not find the keys or registration, they told him that he had one day to find the registration. Fearing imminent arrest, Pvt Sprenger absented himself from his unit and left the installation without authority. On May 11, Corporal (Cpl) Brent Arthurs, another member of the group who had participated in the trailer theft, was found stabbed to death in a remote area.

### 1. *The Prosecution's Theory of the Case*

At trial, the prosecution contended that appellant was agitated about the prospect that an investigation into the trailer theft would delay or cancel his eagerly sought reassignment to the State of Washington, his home state, and that it would affect his forthcoming marriage. According to the prosecution, appellant sought to preclude identification by encouraging Pvt Sprenger to flee the installation and assume a new identity before the investigators could question him further about the trailer. The prosecution further contended that when appellant learned of Cpl Arthurs' discussion with outsiders about the trailer theft, appellant murdered his fellow Marine in order to silence him.

To prove its case, the prosecution called over 3 dozen witnesses and offered nearly 5 dozen exhibits into evidence. Pvt Sprenger, who stated that he was a close personal friend of both appellant and Cpl Arthurs, testified that appellant and Cpl Arthurs had a strained relationship which "regressed" to the point where "Lance Corporal Holt, after some time, didn't like Corporal Arthurs at all." According to Sprenger, both he and Arthurs were skilled motorcyclists, a trait not shared by appellant. Sprenger added that appellant "had a bad bike and no experience," and he resented being teased about these matters by others, particularly Cpl Arthurs.

After Pvt Sprenger, following appellant's suggestion, absented himself on Monday, May 4, appellant telephoned him several times. In those conversations, appellant expressed anger that Cpl Arthurs "had been running his mouth" about Pvt Sprenger's absence and the discovery of the trailer. Sprenger described appellant as becoming "violently mad" about Cpl Arthurs, asserting that appellant said: "He's got to shut up. He's running his mouth."

Pvt Sprenger's testimony was echoed by a number of appellant's friends and acquaintances. According to Arian Goucher, appellant had been worried about the trailer since April. When she and a friend raised the subject of the trailer, appellant "told us to be quiet about it, to shut our mouths; if we didn't, then he was going to shut them for us because this was not a joking matter." She added that "[t]his was extremely serious ... everybody could get in a lot of trouble for it if ... it got out, and he was upset." In late April, appellant told Ms. Goucher that someone was talking about the trailer, that he knew who it was, and that he was "going to take care of it."

On Monday, May 4, appellant told Cpl Charles Sheldon that he was worried about the trailer and that he was concerned that Cpl Arthurs had been talking about it.

Two days later, appellant called Pvt Sprenger from the home of Holly Gallagher, who overheard appellant say that Arthurs "was talking" and was "running his mouth." While listening on an extension phone, Ms. Gallagher heard Pvt Sprenger respond: "He's talking; you got to shut him up. Cut his throat out. Cut his tongue out. You have to shut him up." She also heard appellant tell Pvt Sprenger to stay in Huntington Beach and that he would "take care of" it. Ms. Gallagher, who had dated appellant since March, noted that in contrast to his normal telephone manner—relaxed, cool, and calm—he was pacing back and forth in anger.

Ms. Gallagher said that appellant continued to act in an unusual manner when she saw him on Thursday, May 7. She also observed that he was wearing a knife, which she never had seen him wear prior to the day before. That evening, appellant called Jennifer Bowman, and Ms. Gallagher heard appellant tell Ms. Bowman, " 'If you're any friend of Brent's, you can warn Brent that I'm going to come after him.' "

The prosecution introduced evidence that appellant was seeking Cpl Arthurs on Friday, May 8, and that he found him. LCpl Sheldon and his wife, Shannon, had a conversation with Arthurs that evening in which Arthurs said that he knew that appellant was looking for him. Arthurs visited LCpl John Colvin late Friday afternoon in Colvin's barracks room, at which time Arthurs said that he knew appellant was looking for him, but he did not know why. Colvin told Arthurs that appellant "said that he had to get Arthurs to shut up," and Arthurs adamantly denied saying anything.

Arthurs and Colvin went to chow and returned to LCpl Colvin's room so Colvin could finish packing to go on leave. Appellant arrived at the room, and he and Arthurs talked. Appellant left after about 5 minutes. Colvin invited Arthurs to stay in his room while he was gone and told him that he could obtain access from appellant, who had a key to the room. That key was later found in a wallet on Cpl Arthurs' dead body. Cpl Corey Ridder, who said that he was a good friend of appellant but not a part of the motorcycle group, saw a person matching Cpl Arthurs' physical description with appellant in appellant's room at about 7:00 p.m. on Friday evening.

Pvt Sprenger, who remained absent without leave and in hiding at Huntingon Beach, received several calls from appellant pertaining to Cpl Arthurs on Friday evening. In the first call, appellant said that he was with Cpl Arthurs. In the second, he mentioned Cpl Arthurs' motorcycle. In the third, which occurred sometime after midnight, appellant said that he had "just killed" Cpl Arthurs, that he had Cpl Arthurs' motorcycle, and that he was on his way to see Pvt Sprenger in Huntington Beach. At that point, Pvt Sprenger did not believe appellant's statement that he had killed Cpl Arthurs and taken his bike.

Appellant stopped by LCpl Sheldon's house about 1:00 a.m. on Saturday morning, May 9, and said that he had "just killed" Cpl Arthurs. When Sheldon shrugged it off in disbelief, appellant put his seabag on the floor and rolled it down to show Sheldon a pair of blood-stained jeans. As appellant departed, Sheldon heard the distinctive sound of Cpl Arthurs' motorcycle.

When appellant met Pvt Sprenger at Huntington Beach, he was riding Cpl Arthurs' bike and wearing Cpl Arthurs' leathers, helmet, and gloves. At that point Pvt Sprenger "knew something was wrong" because Cpl Arthurs never would have let anyone else wear his leathers or helmet and was "very protective of his motorcycle." Appellant proceeded to provide Pvt Sprenger with the details of how he had lured Cpl Arthurs to an isolated area and repeatedly stabbed him as he begged for his life. Pvt Sprenger testified that after appellant showed him the blood-stained jeans—

> I asked him why, and he said that Brent needed to die, "He wouldn't shut his f—ing mouth." That was what he said. He said he was going to get us all in trouble, "He was going to get my orders canked," and we were all going to go to jail if he kept talking.

On Saturday morning, May 9, at about 6:00 a.m., appellant went to Cpl Ridder's room and told him that he had stabbed a person to death. When Ridder asked who he had killed, appellant stated that it was the same person that Ridder had seen him with the night before. Cpl Ridder's roommate, LCpl Henry Slack, Jr., was awakened by appellant's entry into the room and corroborated the details that appellant had related about the stabbing incident.

Later on Saturday, May 9, appellant visited LCpl Sheldon and his wife, Shannon. Appellant was accompanied by his fiancée, Ladona Knight, who had flown in from Boston. They were planning to travel to appellant's home in Washington State, where they would get married. Shannon, who had been told by Cpl Sheldon about appellant's statement that he had killed Cpl Arthurs, took appellant into a room away from the others and confronted him. At first, appellant denied killing Arthurs, but then acknowledged it and provided the details to Shannon.

On Sunday, May 10, appellant and his fiancée traveled with Pvt Sprenger to Washington State. Cpl Arthurs' body was discovered

on Monday, May 11. At trial, the prosecution introduced evidence from civilian police investigators and others concerning the location of the body, probable time of death, and related matters.

The police investigators obtained statements implicating appellant and arrested him in Seattle, Washington, on Sunday, May 17. On that occasion, they seized a motorcycle that had been found at the Seattle airport and a helmet, leathers, and boots from a garage at appellant's mother's home—all later identified as belonging to Cpl Arthurs. In addition, they seized a pair of jeans from the garage.

Various witnesses, including members of appellant's family, described his use of the motorcycle while in Washington, as well as his possession of the leathers. At trial, Pvt Sprenger identified the seized pair of jeans as the same jeans appellant had shown him on Saturday, May 9, when appellant stated that he had killed Cpl Arthurs. After defense counsel obtained assurances from trial counsel and the military judge that the jeans could be subjected to further testing, the jeans were admitted into evidence without defense objection. The prosecution introduced expert testimony identifying stains on the jeans as human blood, although the stains could not be linked to Cpl Arthurs or any particular blood type. The prosecution also introduced expert testimony that the stain pattern was consistent with blood spatter caused by a knife. These matters are considered further in Part B, *infra.*

The prosecution evidence also included documents and testimony corroborating the statements of the Government's primary witnesses, as well as evidence in rebuttal of the defense theory, discussed below at (16–17), that Cpl Arthurs had given his motorcycle to appellant as part of an insurance-fraud scam.

### 2. *The Defense Theory of the Case*

The defense sought to convince the members of the court-martial that others involved in the trailer theft had both motive and opportunity to kill Cpl Arthurs; that Cpl Arthurs was seen alive after the time when appellant left the Camp Pendleton area for the State of Washington; and that Cpl Arthurs had given the motorcycle to appellant as part of an insurance-fraud scheme in which he would falsely claim that it had been stolen.

The defense vigorously attacked the credibility of the prosecution witnesses through cross-examination and rebuttal testimony. Pvt Sprenger, who was described by the defense as "[t]he cornerstone of the prosecution case," was depicted as a witness with "a biography that was littered in the past with criminal offenses, lies, deceptions, half-truths, and feigned lack of recollection." The defense painted a picture of Pvt Sprenger as a "man who calls himself a Marine [and who] has an insatiable appetite for two things: food and other people's property." The defense asked the court-martial panel to disregard the testimony of Pvt Sprenger, who not only was an accomplice in the trailer theft, but also testified under a grant of immunity.

The defense also focused on the credibility of the other four witnesses who testified that appellant had admitted killing Cpl Arthurs—Shannon Sheldon, LCpl Sheldon, Cpl Ridder, and LCpl Slack. The defense suggested motives to lie, the "overbearing ... influence" of the prosecution, and inconsistencies between trial testimony and earlier statements to investigators and detectives.

The defense offered several witnesses who testified that they had seen Arthurs on Saturday, May 9, or Sunday, May 10—that is, after the time at which the prosecution witnesses testified that appellant had acknowledged killing Cpl Arthurs. The defense argued that this demonstrated that Arthurs could not have been killed Friday night, as the prosecution theorized, and that because appellant was on leave beginning on May 9, he had an alibi. Additionally, the defense offered witnesses who had seen appellant during the general time frame when the murder allegedly had occurred. The defense also attacked the credibility of the autopsy and the scientific bases for ascertaining the time of death.

The defense challenged the prosecution's theory that Cpl Arthurs had been killed at the site in DeLuz Canyon Road where his

body was found on May 11. The defense emphasized a lack of blood and minimal disturbance of vegetation at the scene, as well as an absence of signs of a struggle, for the purpose of demonstrating that the location was the site of a "dump job," not a murder.

Based on this theory, the defense elicited evidence tending to show that appellant could not have transported Cpl Arthurs' dead and bloody body in his automobile. This included evidence that the U.S. Army Criminal Investigation laboratory (USACIL) at Fort Gillem, Georgia, had found no trace of blood in appellant's vehicle or on a seized leather jacket.

With respect to the jeans which the prosecution asserted had been worn by appellant on the night Cpl Arthurs was murdered, the defense challenged the identification of the stains as coming from human blood as well as the proposition that it was the victim's blood. The defense sharply challenged the prosecution's expert witnesses as to their methodology, conclusions, and credibility. The defense emphasized that the initial visual testing of the pants at an Army crime laboratory had revealed no stains, no items in the pockets of the pants, and no signs of recent laundering; in contrast, the later testing had revealed stains, a coin and gold foil in the pocket, and the smell of recent laundering. Through cross-examination and its own witnesses, the defense challenged the personal and professional integrity of the prosecution's blood spatter expert; the credibility of the spatter testing technique that he had used and the conclusions he drew from it; the effect of luminol testing on the spatters; and the probative value of the results of the luminol testing.

In addition to attacking the prosecution's evidence, the defense offered an explanation of appellant's possession of Cpl Arthurs' motorcycle. The defense introduced evidence that Cpl Arthurs had crashed his motorcycle in 1991 and that the insurance company had paid off the loan, freeing him to buy a new one. That new motorcycle, which came with one year of free insurance, also had been in several mishaps. Cpl Arthurs did not submit

claims, however, because of concern about the potential impact on his free insurance. According to Cpl Dean Janssen, Cpl Arthurs told Pvt Sprenger around mid-March, that he hoped his motorcycle would be stolen, so he could get insurance money and buy a better bike, and that Pvt Sprenger had answered that he could make the necessary arrangements. The defense argued that Cpl Arthurs, pursuant to that plan, gave his motorcycle and leathers to appellant. The defense suggested that the murder was committed by Pvt Sprenger, and that Sprenger and the others had conspired to frame appellant.

## B. TESTING OF THE JEANS FOR EVIDENCE CONCERNING THE DEATH OF CPL ARTHURS

On Sunday, May 17—6 days after the discovery of Cpl Arthurs' body—appellant was arrested while in Seattle on leave. During a consent search following the arrest, investigators seized a pair of jeans, which later was introduced into evidence without objection as prosecution exhibit 9. The jeans were transmitted, along with 41 other items, to the USACIL for examination. The testing revealed no signs of blood on the pants or any evidence of forensic significance on any of the items submitted to the laboratory. Although the Government sought reexamination by another laboratory, these requests were refused on the basis that the USACIL already had undertaken the tests.

Charges against appellant, including murder, were referred for investigation under Article 32, UCMJ, 10 USC § 832, and the investigation was completed on August 4, 1992. The investigating officer, Major N, recommended that the charges be referred to a general court-martial as a capital case. On August 21, the convening authority referred the charges for trial by general court-martial as a capital case. Cf. RCM 201(f)(1)(A)(iii), Manual for Courts–Martial, United States, 1984.[1]

The formal proceedings began on September 14, 1992, with a pretrial session under

---

1. All Manual provisions are cited to the version applicable at trial. The 1998 version is unchanged, unless otherwise indicated. See n. 2, supra.

Article 39(a), UCMJ, 10 USC § 839(a). After several continuances over 3 months, additional Article 39(a) sessions were held during the fall of 1992 to consider numerous defense motions, including jurisdictional challenges and challenges to various aspects of the pretrial investigation and referral procedures. This phase included a motion requesting a new Article 32 hearing which alleged that Major N was not an impartial investigating officer. The motion was based on the fact that Major N served as a prosecutor in unrelated cases, and cited certain aspects of his conduct of the investigation. The motion, which was denied and which has not been appealed, was based on actions that have not been challenged by appellant in the post-trial proceedings in this case.

Major N, who completed his duties as investigating officer in August 1992, attended a forensic evidence course in San Francisco during December that included a presentation on blood spatter analysis by a civilian law enforcement official, Rod Englert. Upon his return to Camp Pendleton, Major N had a conversation with trial counsel about the present case in which he described Mr. Englert's presentation and provided him with Mr. Englert's name and phone number. Final Brief at 6.

Appellant entered his pleas on December 22. Trial counsel sent the jeans to Mr. Englert for testing on December 23, 1992, and notified the defense of the testing on January 4, 1993. According to information developed later during trial, which is not in dispute, trial counsel advised defense counsel on January 4 that testing was performed by Mr. Englert, adding that luminol testing of the jeans had indicated blood stains, that the pattern of stains revealed blood spatter consistent with stabbing, and that further testing was proceeding to determine whether it was human blood.

The January 4 discussion between the parties was the first notice that the defense received about the retesting. The defense submitted no motions or objections at that time concerning the manner in which trial counsel had proceeded with respect to the testing of the jeans, nor did the defense submit any motions with respect to further testing of the jeans.

The last pretrial motion session was held on January 6, 1993. On January 7, *voir dire* and challenge proceedings were concluded, and both parties presented their opening statements. The following morning, the prosecution began presentation of its case on the merits, focusing on testimony concerning the trailer theft, the death of Cpl Arthurs, and the investigation into his death.

On January 12, trial counsel learned that the further testing had identified the stain on the jeans as human blood and informed defense counsel of that result. The testing was performed by Dr. Raymond Grimsbo, a colleague of Mr. Englert. No motions or objections were made by the defense at this time, and the court-martial proceeded to consider the prosecution's evidence with respect to the events of the previous May.

The retesting of the jeans during December and January was first brought to the attention of the military judge at an Article 39(a) session on January 14. At that time, the defense described the prior testing of the jeans by the USACIL in July 1992 and noted that the defense had informed the USACIL that if the testing would destroy the samples, the defense wanted at least 50 percent of the samples saved for defense testing. *See United States v. Garries*, 22 MJ 288, 293 (CMA), *cert. denied*, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986).

Defense counsel added that trial counsel had submitted the jeans for testing by Mr. Englert in December and that defense counsel had not learned of the testing until January 4, which meant that the defense had been unable—prior to testing by Mr. Englert—to submit a request under *Garries* to preserve a sample for defense testing.

After defense counsel completed his narrative, the military judge asked him to tell the court what relief he was requesting. Defense counsel replied that he was seeking suppression of the laboratory test results identifying the stains as human blood. Following further discussion of the basis for the request, the military judge summarized the defense position by observing that the de-

fense had articulated two separate motions. The first motion was to exclude the laboratory results "based on lack of relevance" on the grounds that laboratory tests simply revealed the stains as containing human antigens, which did not prove that the stains contained human blood or that the stains could be identified with any particular person. The second motion was based upon "a violation of the mechanics provided in *Garries.*" Defense counsel agreed with the military judge's characterization of the defense position.

With respect to the first motion, concerning relevance, the military judge ruled that otherwise admissible evidence of a laboratory test identifying the stains as human blood would be relevant and that the probative value would substantially outweigh the danger of unfair prejudice. *See* Mil.R.Evid. 401, 402, and 403.

The second issue, concerning the *Garries* objection, involved the question of whether the blood-stain evidence had been fully consumed by the Government in testing before trial without safeguards to ensure an opportunity for independent defense testing or verification. *See Garries, supra* at 293. Trial counsel asserted: "I believe that there is sufficient sample remaining. I have been told that there is sufficient sample remaining for additional testing." Defense counsel indicated that they were "in the process of getting our own independent expert to make certain that that is in fact the truth," but that in their "brief conversation" with their expert, they "were informed that luminol destroys the ability to accurately get in and reanalyze it. . . ." Trial counsel argued that the Government's expert "categorically disagrees with that."

After the parties concluded their presentation on the *Garries* issue, the military judge noted that the defense concern was premature:

Then we have nothing to talk about yet, have we, until a factual determination is made as to whether or not there's even a problem under *Garries.* If both sides agree with me that if sufficient blood remains—notwithstanding the application of

the luminol—to render a test, then while the Government might have proceeded differently, you know, no harm, no foul; and if you can have your analysis, if it comes back differently from theirs, you've got a fight. If it comes back the same as theirs, you can go another way; but in either event, if there's enough of a blood sample left for analysis, *Garries* doesn't walk in this courtroom. Am I right?

The defense agreed.

The military judge then made clear that he was leaving the matter open, pending development of further information:

MJ: What I'm saying to you is I don't have to decide this now.

IMC: I would agree.

MJ: And I won't.

Defense counsel indicated that they would have an answer from their expert within 24 hours as to whether the luminol testing had destroyed the sample and prevented further testing for blood.

After a brief recess, assistant trial counsel revealed that he had called the defense expert and asked her specifically whether luminol would destroy the proteins in a sample and prohibit further testing for blood. Her response, according to assistant trial counsel, was that luminol may dilute the sample but does not destroy the proteins [for] further testing. Defense counsel answered:

That's consistent with what I've told the court. She's saying it may or may not. Okay. I just wanted to make the court clear that I wasn't—I'm still accurate on that. That's what she said. She's going to have to see it. Okay.

Counsel for the parties and the military judge then addressed the issue of how to proceed while awaiting the defense expert's report on the testing issue. Mr. Englert, the prosecution's spatter expert, was already on his way to the trial, but Dr. Grimsbo, whose tests identified the stains as human blood, was scheduled to arrive at a later date. The military judge obtained an assurance from trial counsel that Mr. Englert would testify only that the spatter pattern was consistent with blood and would not testify that it was, in fact, blood. Based upon that assurance,

the military judge proposed that the prosecution proceed with Mr. Englert's testimony and that Dr. Grimsbo's travel be held in abeyance. After the military judge advised the defense that he would consider the possibility of later recalling Mr. Englert for further cross-examination if so requested by the defense, the defense offered no objection to proceeding with Mr. Englert's testimony.

Mr. Englert testified on January 14. He was qualified and accepted by the court as an expert witness in blood spatter and luminol testing with no objection by the defense. Mr. Englert discussed the basics of blood-spatter analysis and luminol testing, described the spatter pattern on the jeans in the present case as consistent with a stabbing, and stated that a stain in the right front pocket was consistent with placing a bloody hand in the pocket. There was no defense objection to the substance of Mr. Englert's testimony. At the conclusion of direct examination, defense counsel asked to defer cross-examination until the following week. Notwithstanding a prosecution objection, the military judge granted that request.

On January 20, Mr. Englert returned to the courtroom, where he was subjected to vigorous cross-examination. After noting that the jeans had been subjected to luminol tests on three separate occasions, he acknowledged that such testing could dilute and change the pattern. Also, he agreed that there were several possible explanations for the stains other than stabbing, that luminol reacted with materials other than blood, and that there was no way to determine the age of the stains. He reflected disagreement with statements or theories propounded in leading treatises and texts on blood-spatter analysis and the effects on luminol testing from such things as laundering. He was unable to utilize an equation used to determine the angle of a drop of blood, and he was unable to identify the causes of a variety of spatters that had been prepared by the defense. The defense also brought out through cross-examination matters relating to his character and reputation as an analyst. This material was used by the defense to attack his credibility before the court members. It did not form the basis, however, for an objection to admissibility of his testimony as a matter of law.

On January 21, after completing Mr. Englert's testimony and hearing from several other witnesses, the parties returned to the *Garries* issue in an Article 39(a) session. Trial counsel indicated that Dr. Grimsbo was available to travel to Camp Pendleton and testify on January 22 concerning identification of the stain as blood, depending on the defense intention with respect to the *Garries* issue. Defense counsel indicated that his expert was still awaiting raw data from Dr. Grimsbo in order to complete her work on the jeans, and the matter was left unresolved. In a further Article 39(a) session later in the day, the following colloquy occurred:

TC: Sir, finally, there is still an inchoate *Garries* motion on the Government's witness that's flying in from Portland. I believe that *Garries* has been completely complied with and that even if there could not be an additional retest, it should still—his testimony should still be admissible and be received into evidence.

MJ: Does the defense wish to pursue the motion?

IMC: Based on our limited contact—and again, I've been in telephonic contact—it does not look—in other words, okay, rather than getting into detail, it does not look like we have a righteous *Garries* motion at this point in time.

MJ: Very well. If your opinion changes, of course you have leave to make it at any pertinent point.

IMC: Fine. Okay.

Dr. Grimsbo took the stand the next morning. The defense offered no objections or motions relating to admissibility of his testimony based on his qualifications as an expert, the scientific validity of his testing procedures, or any *Garries* discovery issues.

Dr. Grimsbo testified that Mr. Englert brought the jeans to his lab on December 28, 1992, and that he began his examination of them on January 4, 1993. At the outset, he noted that the jeans had an air of fresh laundering. In the right front pocket, he

discovered a dime and a piece of gold foil, probably from a breath mint, that "had gone through a laundering process and got all wadded up there." Additionally, he noted "numerous light brown stains" on the jeans that were visible without enhancement.

After describing the testing that he performed on the jeans at Mr. Englert's request, he opined that the stains were human blood. Further testing to determine type or possible source of the blood, however, was unsuccessful for any of several possible reasons, such as chemical degradation due to natural causes.

On cross-examination, Dr. Grimsbo maintained that luminescence generally does not degrade the material and, on garments like cloth, only rarely alters the size and shape of bloodstains. He acknowledged that washing can change the size and shape of a blood stain and reduce the number of stains. He testified that he had no idea whose blood was on the jeans, how long the bloodstains had been on the jeans, or how many times the jeans had been washed after they had been stained with the blood. He also testified that while the pattern was consistent with "cast-off" from a stabbing motion, he would not say that it was any more consistent with a stabbing than with "any other innocent activity."

During its case-in-chief, the defense called Chief Warrant Officer–3 Mills as a witness. Mr. Mills, a forensic chemist at the USACIL, had participated in the initial examination of appellant's jeans and 41 other pieces of evidence in connection with this case, along with another laboratory official. He described the procedures he used in detail. He explained that he had not used luminol testing because it reacted with substances other than blood. He also noted concern that luminol can have a "destructive effect on bloodstains," including changing the size and shape of patterns of individual spots and the number of spots. He noted that the potential for alteration of the evidence created potential problems under the laboratory's *Garries* policy of saving half of a sample, so the lab had shifted away from luminol testing to other methods. He acknowledged, however, that luminol testing could reveal the presence of blood under some circumstances where the other tests used by the laboratory could not do so.

Mills noted that after doing a visual screening and an examination using an alternate light source, he detected no bloodstains on the jeans or on any other item submitted for examination. He further stated that the stains visible on the jeans at the time of trial were not present on the jeans at the time he examined them at the Army laboratory. He also said he was "very certain" that there were no coins or pieces of gold foil in any of the pockets and that the jeans did not have the smell of being freshly laundered. It was his view that the stain patterns could not be interpreted as being consistent with a stabbing.

Two other expert witnesses testified for the defense in connection with the retesting of the jeans and related matters. Parker Bell—a criminalist, consultant, and attorney in private practice—offered testimony contrary to Mr. Englert's views. He had prepared a set of stains that the defense earlier had used to test Mr. Englert's testimony. He used them to explain to the members that a stain that might appear at first glance to have been made in a certain way and under certain circumstances actually might well have been made in a different manner. He also testified that a trigonometric formula for figuring angularity, which Mr. Englert had stated was obsolete, was "still a scientifically accepted way of determining angle of impact." Using photographs to illustrate his testimony, he testified that washing and laundering could lead to differing interpretations as to the cause of a stain. He also expressed disagreement with Mr. Englert's method for interpreting the velocity and pattern of blood spatters, and described substances other than blood that could cause positive reactions in luminol testing. In addition, he disagreed with Mr. Englert's assessment of the blood spatters and stated that it was not possible to testify that the stains were any more consistent with stabbing than with other activity.

The other defense expert witness was Ms. Carol Hunter, a criminologist, who conducted further testing on the jeans for the defense

following the tests conducted by Mr. Englert and Dr. Grimsbo. She found both positive and negative results on the areas identified as positive by Mr. Englert and Dr. Grimsbo, as well as false positives on various control samples. As a result, she concluded that the positive stains were inconclusive for human blood.

On cross-examination by the prosecution, Ms. Hunter acknowledged that she could not say whether the positive results did or did not indicate the presence of human blood. She acknowledged that she did not use the Takayama confirmatory test, which Dr. Grimsbo had performed, and she agreed that a positive Takayama test probably would convince her that the stain was human blood. Ms. Hunter gave no indication that she lacked sufficient samples to conduct testing on behalf of the defense.

During both cross-examination and in its case-in-chief, defense counsel vigorously questioned the Government's scientific evidence. The defense, in its closing statement, specifically challenged the credibility of the Government's case. The defense strategy clearly was to use the cross-examination of Mr. Englert and Dr. Grimsbo, and its direct examination of Mr. Mills, Mr. Bell, and Ms. Hunter, in an effort to raise a reasonable doubt in the minds of members of the court-martial panel. The testimony elicited by the defense, however, was not cited or relied upon for the purpose of disqualifying Mr. Englert or Dr. Grimsbo as experts as a matter of law, or as grounds for precluding admissibility of their testimony.

## II. DISCUSSION

### A. CONDUCT OF THE INVESTIGATING OFFICER

Appellant has asked that his conviction be set aside and that the case be remanded for a rehearing on the grounds that the investigating officer acted improperly in providing information about Mr. Englert and his testing procedures to trial counsel after the case had been referred to trial. The defense became aware of the retesting during trial but did not learn of the investigating officer's communication to trial counsel until after trial.

Before charges may be referred to a general court-martial, there must be a "thorough and impartial investigation" under Article 32(a), UCMJ, 10 USC § 832(a). We have referred to an Article 32 investigation as a "judicial proceeding," *United States v. Bell,* 44 MJ 403, 406 (1996), in which *ex parte* communications between the investigating officer and the prosecution are improper. *United States v. Argo,* 46 MJ 454, 458 (1997), *citing United States v. Payne,* 3 MJ 354 (CMA 1977).[2]

The investigating officer is required to "inquire into the truth and form of the charges, and such other matters as may be necessary to make a recommendation as to the disposition of the charges." RCM 405(e).[3] The investigating officer must submit a report to the commander who ordered the investigation, and the "commander shall promptly cause a copy of the report to be delivered to each accused." RCM 405(j)(3). "The investigating officer is disqualified" from acting subsequently "in the same case in any other capacity." RCM 405(d)(1).

 These considerations envision an investigation that results in an impartial report containing a recommendation for use by the command. The accused has a right to a copy of the report. The court below concluded that the actions of Major N were inconsistent with the requirements of Article 32 and RCM 405: "[P]rovision of information solely to the assigned prosecutor, with no simultaneous, or even serial, notification to the defense, makes the act *appear*, at least, as one of an impermissible, adjunct trial counsel."

---

**2.** Although the Article 32 officer does not preside over an adversarial proceeding leading to an adjudication of guilt or innocence, the requirement for impartiality means that the investigative and advisory functions of the Article 32 officer must be performed, insofar as practicable, by a person possessing the impartiality similar to that required of a military judge. *See United States v. Reynolds,* 24 MJ 261, 263 (CMA 1987).

**3.** The 1998 version of this provision is different from the version applicable in this case, but this statement is the same.

46 MJ at 862 (emphasis in original). We agree that the actions of the investigating officer may have created at least the appearance of impropriety by providing trial counsel with what was, in effect, a supplementary report that was neither transmitted to the commander who ordered the investigation nor served on the accused.[4]

Depending on the context, such an improper post-referral communication may raise two different issues, involving two distinct forms of relief. If the communication supports a claim of bias in the conduct of the Article 32 investigation, an appellant may request that the case be remanded for a new investigation based on denial of the right to an impartial Article 32 proceeding. Second, if the communication supports a claim that the investigating officer improperly served in a prohibited role, such as trial counsel, an appellant may request a new trial if there has been prejudicial error.

In the present appeal, appellant has not claimed that a new Article 32 investigation is required on the ground that the investigating officer's action demonstrated bias in the conduct of the investigation. *See Payne*, 3 MJ at 357. Accordingly, the sole question before us with respect to the granted issue is whether the improper communication from the investigating officer led to prejudicial error at trial.[5]

Major N's role consisted of providing a suggestion to trial counsel as to the possibility of using an individual as a potential witness and to test certain evidence. Major N did not exercise any form of prosecutorial discretion or make any tactical or strategic decisions with respect to the conduct of the trial. The decisions with respect to testing the jeans, timing of information provided to the defense, and presentation of testimony by Mr. Englert and Dr. Grimsbo were made by trial counsel, not by Major N.

The fact that the investigating officer provided information about this form of testing to trial counsel does not demonstrate that the improper communication led to prejudicial error at trial. All pertinent actions were taken by trial counsel and were known by defense counsel at the time of trial. The legal issues surrounding the value of the jeans and related evidence involved the qualifications of Mr. Englert and Dr. Grimsbo as expert witnesses, admissibility of their testimony, and the possibility of a *Garries* violation. Either Mr. Englert and Dr. Grimsbo were experts, or they were not. Either their testimony was relevant and admissible, or it was not. Either there was a valid objection under *Garries*, or there was not. Information concerning the role of Major N in suggesting the possibility of such testing to trial counsel would not have made a substantive difference as to the propriety of the military judge's rulings on any of these issues. Accordingly, we conclude that the role of Major N did not result in prejudicial error during the trial proceedings. *United States v. Jennings*, 49 MJ 549, 551–52 (C.G.Ct.Crim.App. 1998); *cf. Wright v. United States*, 2 MJ 9, 10–11 (CMA 1976).

It is also noteworthy in this regard that when appellant described the investigating officer's role in these matters in two separate post-trial submissions to the convening authority under RCM 1105—including a sub-

4. In view of the unique facts of this case—an *ex parte* post-referral communication to the trial counsel—we decline to speculate as to the circumstances, if any, in which it would be appropriate for an investigating officer to provide an unrequested supplementary recommendation to the command. At a minimum, however, any such communication must be reported promptly to the command and to the accused. If the trial counsel or the staff judge advocate becomes aware of a communication by the investigating officer about the case to the command, the prosecution, or government investigators after the investigating officer's report has been submitted, the substance of the communication shall be reported promptly to the commander who ordered the investigation and the accused. If such a matter arises after referral, the information shall be provided promptly to the commander who referred the case to trial, the military judge, and the accused. The parties will be in the best position to determine whether any motions or objections are warranted based upon the nature of the information.

5. For purposes of the present appeal, we shall assume, without deciding, that the communication from Major N to trial counsel had the effect of making Major N a *de facto* member of the prosecution.

mission filed by new counsel retained specifically to focus on the post-trial action—the post-trial submissions simply took note of the discussions between Major N and trial counsel in the course of providing a narrative description of the events leading to the testing of the jeans by Mr. Englert and Dr. Grimsbo. Neither of appellant's post-trial submissions set forth an objection with respect to the role for purposes of impugning the fairness of the Article 32 investigation or the fairness of the trial itself. Although we do not regard appellant's post-trial submissions as waiving further appellate review of issues concerning the investigating officer's role, these submissions underscore the lack of prejudice.

## B. EVIDENCE TAMPERING

■ In the second granted issue, appellant contends that the jeans may have been tampered with prior to their introduction into evidence and that we should order an inquiry into that possibility. He points to evidence introduced at trial indicating that the jeans, when seized from appellant and when tested in the USACIL, contained no visible blood stains, did not smell freshly laundered, and had nothing in their pockets. He argues that this evidence should be contrasted with evidence that the jeans given to Mr. Englert for testing and that were admitted into evidence at trial had numerous visible stains, smelled freshly laundered, and had items in their pockets.

The evidentiary value of the jeans was vigorously contested by the defense at trial through close cross-examination of prosecution witnesses and presentation of defense evidence—including evidence suggesting possible tampering. Appellant, however, chose to raise these matters for consideration by the court-martial panel for purposes of suggesting that they should find appellant not guilty of the charges. Appellant did not move to preclude introduction of the jeans based on possible tampering, and he made no motion or objection regarding the authenticity of the jeans or their admissibility as evidence. Because these issues were raised for consideration by the court-martial panel on the issue of guilt or innocence, rather than before the military judge as a matter of admissibility, the weight to be given such evidence was a matter for the members. In that context, the questions raised by appellant do not provide a basis for finding prejudicial error at trial. *See* Mil.R.Evid. 103, Manual, *supra*.

## C. THE OPPORTUNITY FOR DEFENSE TESTING OF THE EVIDENCE

■ In the third granted issue, appellant contends that the luminol testing of the jeans by Mr. Englert and Dr. Grimsbo resulted in "destruction" of "potentially exculpatory evidence" that was of such a nature that he could not obtain comparable evidence by other reasonably available means. *See California v. Trombetta*, 467 U.S. 479, 487, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Kern*, 22 MJ 49, 51 (CMA 1986). He contends that this testing, which was done without first informing the defense and permitting the defense an opportunity to have a representative present, destroyed the exculpatory value of the pants and thereby denied him equal access to the evidence, in violation of Article 46, UCMJ, 10 USC § 846. *See Garries*, 22 MJ at 293 and n. 6 (in view of Article 46, "the better practice is to inform the accused when testing may consume the only available samples and permit the defense an opportunity to have a representative present"). *Accord United States v. Mobley*, 31 MJ 273, 277–78 (CMA 1990). We conclude, however, that appellant did not preserve his objection for appellate review. *See* Mil.R.Evid. 103.

As noted in section I.B., *supra*, the defense initially raised the issue before the military judge on January 14, 1993, through a motion to suppress all results of the retesting, including Englert's and Grimsbo's testimony, suggesting "[n]o compliance with *Garries*." Trial counsel contested the charge of a *Garries* violation, contending that there was enough sample left for defense testing. The defense acknowledged that they had not received a definitive response from their expert as to whether there was any problem in

conducting further tests. Accordingly, the military judge reserved his ruling until the defense expert could determine whether "there's enough of a blood sample left for analysis."

The only subsequent mention of the matter came a week later when trial counsel reminded the military judge of the "inchoate *Garries* motion." Defense counsel at that point stated on the record: "Based on our limited contact [with the defense expert] . . . it does not look like we have a righteous *Garries* motion at this point in time."

Although the military judge invited the defense to pursue the *Garries* issue later if they wished, the defense did not pursue the military judge's invitation to seek a ruling on the *Garries* issue. The defense approach, in this regard, is understandable in light of the testimony of the defense expert witness, Ms. Hunter, who had examined the jeans subsequent to the tests performed by Mr. Englert and Dr. Grimsbo. Her testimony did not reflect an impairment, as a result of the prior testing, with respect to her tests. Although her testimony challenged the results presented by the government experts, she did not assert that the testing previously done by them affected her ability to obtain results from her own tests. If the ability to test had been affected adversely, the defense had ample opportunity to elicit information from her or to introduce other testimony to demonstrate that the Government's testing had so degraded the sample as to hinder such testing. Instead, her extensive and detailed testimony regarding the numerous tests that she ran, if anything, implied that she was not restricted in her testing by the nature or quality of the samples.

Appellant, who had ample opportunity at trial to introduce evidence of a *Garries* violation and to obtain a ruling from the military judge, chose not to do so. As a result, appellant has waived our consideration of this issue. *See* Mil.R.Evid. 103.

## D. SUFFICIENCY OF THE EVIDENCE

▇ Finally, appellant asserts that the evidence is legally insufficient to support the findings. In support of this contention, appellant has provided a lengthy discussion of the evidence that amounts to an invitation to reweigh the evidence and reevaluate credibility. Such consideration of the factual sufficiency of the evidence is outside the statutory parameters of our review. *Compare* Art. 66(c), UCMJ, 10 USC § 867(c) (1994), *with* Art. 67(c), UCMJ, 10 USC § 867(c) (1994). As a matter of law, the question of legal sufficiency requires us to consider the evidence in the light most favorable to the Government, and to determine whether the evidence provides a sufficient basis upon which rational factfinders could find all the essential elements beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence, as summarized in Part I, is more than sufficient to meet that standard.

## III. DECISION

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.